# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

UNITED STATES OF AMERICA     )
                                    )
       v.                     )        CAUSE NO.: 1:09-CR-89-TS
                                      )
DANIEL C. PORTEE             )

## OPINION AND ORDER

On July 25, 2009, during the middle of the day, a police officer observed the Defendant, Daniel C. Portee, carrying an AK-47 style assault rifle and a brick in a residential neighborhood located in a high crime area of Fort Wayne, Indiana. The officer observed the Defendant throw the brick through a window of a residence and then walk between some houses, where he disappeared from sight. After calling for assistance and warning other officers of the rifle, the officers approached the residence and observed a broken front window, a possible bullet hole in the siding near the window, multiple broken chairs that were scattered about, and other evidence suggesting a possible disturbance. The Defendant soon emerged from between the houses. He was carrying a dust pan and broom and claimed to be the maintenance man coming to clean up the mess. The police ordered the Defendant to the ground and handcuffed him. However, the officers could not account for the rifle. An exterior door of the house was open, and the officers observed a drink spilled on the floor and couch cushions in a state of disarray. Concerned for their own safety and the safety of a possible victim, the officers entered the residence, and the officer who had observed the Defendant carrying the rifle found the rifle under the pillows of the Defendant's bed.

On September 17, 2009, the Defendant filed a Motion to Suppress [DE 22]. He contends that the police conducted a warrantless search of his apartment that included moving the

bedspread on his bed, that no exception to the warrant requirement applies, that the search was unconstitutional, and that all of the evidence seized and any statements he made after his arrest must be suppressed.

## BACKGROUND

By way of an Indictment [DE 15] filed on August 26, 2009, the Government charges that on July 25, 2009, the Defendant, who had previously been convicted of a felony, knowingly possessed a firearm (a Norinco SKS rifle) in violation of 18 U.S.C. §§ 922(g)(1) and 924(c). On September 17, 2009, the Defendant moved to suppress and exclude "any and all evidence seized when government agents and/or Fort Wayne Police entered into Defendant's home." (Mot. to Suppress 1, DE 22). In his Motion, the Defendant argued that his residence was searched without a warrant and that he did not consent to the search. On September 25, the Government responded, arguing that exigent circumstances existed that justified the search without a warrant and that the officers searched the residence as a protective sweep. In the alternative, the Government argued that even if the search violated the Fourth Amendment (which the Government does not concede), the Defendant's statements were not "fruit of the poisonous tree," and that the doctrine of inevitable discovery applies to the evidence.

On November 12, the Court conducted an evidentiary hearing on the Defendant's Motion to Suppress. The Defendant was present and represented by Attorney Thomas Allen. The Government was represented by Assistant United States Attorney Anthony Geller. The Court heard testimony from Fort Wayne Police Department (FWPD) Officer Michael Tapp, Sergeant Joel Squadrito, and Officer Robert Hollo. The Court also admitted into evidence various

photographs, a signed advice of rights, and a recording. At the conclusion of the hearing, the Court set a briefing schedule for the parties. On January 8, 2010, the Defendant filed his post-hearing Brief in Support [DE 33]. In his brief, the Defendant argued that the officers exceeded the scope of the exigent circumstances exception because there was no physical evidence or reports of an injured person or gunfire and no visible evidence of a person concealed between the mattress and the box spring that would lead the police to believe it was necessary to search under the bed or bed spread. The Defendant also argued that the need for a protective sweep was not supported by articulable facts or a reasonable belief of danger and that the search of the bed exceed the scope of the rationale for the search. Finally, the Defendant contended that the Government has not met the criteria for the inevitable discovery doctrine. On February 8, the Government filed its Response Brief [DE 60]. The Government argued that the entry and search of Apartment 3 (including in and under the bed) is within the exigent circumstances exception and the protective sweep exception and, as a back-up argument, that the rifle would have been discovered inevitably through the execution of a search warrant, which the officers could have with time secured. The Defendant did not file a reply brief.

## FINDINGS OF FACT

Upon consideration of the credibility of the witnesses (Officer Michael Tapp, Sergeant Joel Squadrito, and Officer Robert Hollo) and the examination of the evidence, the Court makes the following findings of fact.

## A.    The Three Government Witnesses

Officer Michael Tapp has been employed by the FWPD for approximately four and a half years. He is currently assigned as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and has been assigned to the ATF/FWPD Gang Unit for about two years. Prior to being assigned as a TFO, Officer Tapp gained experience working a wide variety of crimes in the southeast section of Fort Wayne, a high crime area. His experience with firearms including training and experience with the FWPD and his own interest in firearms as a hobby.

Sergeant Squadrito has been employed by the FWPD for over twenty years, and he has been a sergeant for approximately seven years. He has been the supervisor of the Gang Unit since March 1, 2009. His experience includes serving as a robbery/homicide investigator, a K-9 supervisor and handler, a member of the Detective Bureau and the Vice and Narcotics Division, and a member of the FWPD's Emergency Services Team (the S.W.A.T. team) for approximately eight years.

Officer Robert Hollo has been employed by the FWPD for approximately two years and one month. He has been assigned to the Gang Unit since May 31, 2009, and before this assignment, he was assigned as uniformed patrol.

## B.    The Events and Circumstances Before the Search of Apartment 3

Just before noon on July 25, 2009, Officer Tapp was dressed in plain clothes and driving alone in an unmarked ATF van in the area of Woodland Avenue and Lafayette Street. Officer Tapp observed an individual, later identified as the Defendant, carrying an assault rifle and a

brick. The magazine was inserted in the weapon. Officer Tapp and the Defendant made eye contact, and the Defendant tried to shield the rifle with his body, turning sideways and walking back between some houses. As Officer Tapp passed the Defendant's location, he continued watching with his mirrors. He saw the Defendant walk back from between the houses and then to the front of a particular home on East Woodland. He observed the Defendant, still holding the rifle, throw the brick through the front window of the house. After throwing the brick through the front window, the Defendant walked back between the houses and disappeared from Officer Tapp's sight.

Over the police radio, Officer Tapp called for back-up, gave the Defendant's description, and warned responding officers about a man walking north with a rifle. Because of the rifle, he was concerned about public safety. Officer Tapp stopped on Woodland Avenue to the west of where he had seen the Defendant, and he put on a bullet proof vest with police markings. Back-up officers arrived and set up separate locations in order to establish a perimeter and find the armed Defendant. Sergeant Joel Squadrito, who was not wearing a uniform and was driving an unmarked police car, was in close proximity and responded quickly. He established a north perimeter, and Officer Hollo established an east perimeter. Sergeant Squadrito eventually drove his police car up the alley and closer to the address that had become the focus of activity; he was on the back side of the house. Other officers, including uniformed officers, also arrived. Officers Tapp and Hollow, along with two uniformed police officers, approached the house from the front. The four officers approached the house in a "stack," a tactical formation that permits officer to cover as many threats as possible including the front, the sides, and the upper areas of the house.

As he approached the house, Officer Tapp observed the broken front window and some broken lawn furniture around the porch area and on the ground. The broke furniture was both in the front of the house and on the side of the house. (Exs. 3, 7–11.) It looked as if there had been a disturbance. A woman was standing on the front porch, and she identified herself as the resident of Apartment 2 of the house. Officer Hollo spoke with the resident of Apartment 2, who indicated that the resident of Apartment 3 and the resident of Apartment 1 had been in an disturbance. The officers were trying to get more information and watching their cover because "an armed suspect [was] probably on the loose." (Tr. 66.) As other officers talked with her, Officer Tapp watched the area between the houses for the armed man. Just a few minutes earlier, Officer Tapp had seen the Defendant walk back into this area with the rifle.

The Defendant, carrying a broom and a dust pan, soon emerged from the space between the houses and walked toward the front of the house where the officers were located. The Defendant appeared distraught, upset, and nervous. The officers ordered the Defendant to the ground, and Officer Hollo handcuffed him. The Defendant told the officers that he was the maintenance man, that he was coming to clean up the mess, and that he lived in Apartment 3 of the house. He also mentioned that he was going to mow the lawn for the landlord. Officer Hollo asked the Defendant if he had a lawnmower, and he answered that he did not. The Defendant did not have the rifle with him. Officer Tapp thought it was "odd" for the Defendant to throw the brick through the window and then return to clean up the mess. (Tr. 14.) The officers were still trying to figure out what was going on, "trying to fit the pieces in this puzzle together." (Tr. 15.) Officer Tapp asked the Defendant a few questions, but the conversation lasted only a minute or two.

Sergeant Squadrito came from the back area of the house to the front after the Defendant was in handcuffs, and he too observed the broken outdoor furniture. Both Officer Tapp and Sergeant Squadrito observed a hole in the siding near the front window of the house, which may have been a bullet hole. Both Officer Tapp and Sergeant Squadrito had seen bullet holes in vinyl siding, which can leave ragged or cracked hole, and both thought the hole near the front window may have been caused by a gunshot. As he approached the front of the house from the back, Sergeant Squadrito observed signs that the disturbance involved Apartment 3. The outer screen door was closed, but the exterior door was open. From outside, Sergeant Squadrito observed a bandanna lying in the middle of the floor, a glass of some sort of liquid tipped over on the floor, and couch cushions in a state of disarray. He had also encountered the Defendant's girlfriend behind the house, and she was "highly agitated" and "very upset." (Tr. 50.) Sergeant Squadrito did not see any injured persons, bodies, or blood evidence from his position outside Apartment 3.

Although the Defendant was in custody, the assault rifle was still unaccounted for. An AK-47 style rifle is a high-powered rifle, and police body armor would not stop a round fired from such a rifle. An AK-47 round can also penetrate a wall, such as the exterior wall of Apartment 1. The officers investigating the situation at the house were vulnerable to being shot from a position inside the house.

The officers tried to open the door to Apartment 1, but it was locked. The resident of Apartment 1 was on the telephone with the resident of Apartment 2. Upon arriving on the scene, it was apparent that some sort of violent disturbance had occurred, but they had not been able to sort out what had taken place or who was involved. Sergeant Squadrito testified that he was concerned about possible victims inside Apartment 3, another armed person inside, and the

safety of those standing outside the house. Thus, because of the signs of a disturbance both outside and inside Apartment 3, Sergeant Squadrito decided that a team of officers would go into Apartment 3 to check for a potential victim and perform a protective sweep. The door to Apartment 3 was located on the side of the house in the area between the houses where the Defendant had gone, and the doors to Apartments 1 and 2 were located at the front of the house. (Exs. 2, 2a, 3.) When the Defendant earlier disappeared with the rifle, he had walked between the houses in the area where the door to Apartment 3 was located. Sergeant Squadrito had previously encountered the Defendant and was aware of the Defendant's capability to be violent. The Defendant had been assigned alerts in the law enforcement computer database system because of prior instances of resisting law enforcement. Because of the rapid evolution of the situation, the safety concerns, and the concern that an injured person may need aid, Sergeant Squadrito "really didn't know what [the police officers] [would] encounter once [they] got inside that apartment." (Tr. 53.)

According to Officer Tapp, these events were happening quickly. It took only about three to five minutes to approach the house, and it took about another three to five minutes in order to complete the sweep of Apartment 3. No more than approximately ten minutes elapsed from when Officer Tapp arrived to when the rifle was discovered. In Sergeant Squadrito's estimation, only about five to eight minutes elapsed from when he first arrived at the back of the house until the officers entered Apartment 3. Sergeant Squadrito concluded that they did not have time to obtain a search warrant because they needed to get the situation under control and to secure the scene, to ensure there were no victims or injured persons in Apartment 3, and to make sure no one was in Apartment 3. An injured victim could have had only moments before death. It

typically takes an hour or two to obtain a search warrant, and it would have been dangerous for officers to stand outside the house for an hour or more while a warrant was obtained. Based upon their experience, Officer Tapp and Sergeant Squadrito testified that they would have had no difficulty obtaining a search warrant for Apartment 3 based upon this incident if they had the time.

C. **The Search of Apartment 3 and the Discovery of the Rifle**

Sergeant Squadrito and Officer Tapp were among the officers who conducted the search of Apartment 3, which was a very small apartment. The officers testified that the search was designed to look for people and not for evidence. They looked in places where people could be hiding. The officers moved through the apartment clearing each room, but found no people inside. In the process, Officer Tapp found the rifle (an SKS assault rifle) with the magazine in the bedroom. (Exs. 12, 12a.)

In the bedroom, Officer Tapp observed that the bed was made and that the bed spread was covering both sides of the bed. The bed was on a frame, and the bottom of the bed was approximately four to eight inches off the floor. Officer Tapp could not recall whether the bed spread was hanging below the bottom of the box spring. The pillows were under the bed spread across the width of the bed, and the head of the bed was against the wall. Officer Tapp could see that no one was on top of the bed, but when he entered the bedroom, he could not discern whether they were pillows under the bed spread. The bed basically looked normal, and there was nothing about the bed that gave him an indication that someone was underneath it.

Officer Tapp testified that he was concerned that a person (whether a victim or another

person) could be concealed underneath the bed or between the mattresses because in a different incident he had encountered a person hiding between mattresses. He testified that it is not always apparent when a person is hiding between a mattress and a box spring, and that it depends on the bed, the position, and the size of the person. Officer Tapp, positioned about one to two feet from the head of the bed and holding a weapon in his hand, pulled back a portion of the bed spread to get a grip of the mattress and the box spring in order to lift the bed and look under it. Upon doing so, he observed the magazine of the rifle sticking out from under the pillows. Officer Tapp testified that, without pulling back the bed spread, it would have been difficult to lift the mattress and the box spring in order to see whether anyone was hiding there. Officer Hollo received the gun from Officer Tapp and placed it into evidence after taking photographs. (Ex. 12, 12a.)

### D.     The Post-Search Piecing Together of Facts

Officer Tapp later interviewed the Defendant, his girlfriend, and the resident of Apartment 1. At some point, Officer Tapp learned that the Defendant's girlfriend, Britany Fuqua, also stayed at Apartment 3. He testified that he did not recall seeing the Defendant's girlfriend until after Apartment 3 was cleared. He explained that he remained in the front of the house for most of the incident and was not in a position to see her in the back of the house.

The officers did not clear or search Apartment 1 or Apartment 2. After searching Apartment 3, the officers learned that the resident of Apartment 1, Eddie Townsend, was not inside his apartment, but he was in telephone contact with one of the individuals at the scene. The resident of Apartment 1 refused to return to the residence, but the door to Apartment 1 was locked. Because the safety of the Apartment 1 resident was not in question, the officers decided

it was not necessary to forcibly enter the apartment to conduct a protective sweep. Likewise, the resident of Apartment 2, Diane Hardimon, was safe and standing on the front porch, and she did not seem to be involved in the disturbance.

After the search of Apartment 3, Officer Hollo talked to the Defendant's girlfriend, who had come onto the scene from the back of the house. She described an earlier incident with the resident of Apartment 1 over the chairs. The Defendant's girlfriend stated that she and the resident of Apartment 2 were sitting on the chairs when the resident of Apartment 1 came home. He began arguing with the Defendant's girlfriend about her sitting on his chairs, and she threw the chairs into the front yard, causing them to break. As she walked back to Apartment 3 with her child, the resident of Apartment 1 picked up a stack of chairs and threw them at her. The Defendant's girlfriend then left the residence before the police arrived.

### E.      The Post-Arrest Statements

Officer Tapp made a videotaped recording of his interview with the Defendant, and during the interview, Officer Tapp provided the Defendant with an advisement of *Miranda* rights. (Exs. 4, 5) Initially, the Defendant denied that the rifle was his, but Officer Tapp explained that he had observed the Defendant carrying the brick and the rifle and throwing the brick through the window. The Defendant then acceded to Officer Tapp's observations and admitted possessing the rifle. The Defendant explained that an altercation had occurred between the resident of Apartment 1 and the Defendant's girlfriend, that he was upset about the resident of Apartment 1 hitting the Defendant's girlfriend with the chairs, and that he probably would not have shot the resident of Apartment 1. Officer Tapp decided not to arrest the Defendant after the

interview, telling the Defendant that the Defendant was going to go home, and confirming with the Defendant that he was not going to do anything stupid. However, Officer Tapp was still investigating what had happened.

## DISCUSSION

The parties present three legal issues in the Motion to Suppress and related materials. The first issue is whether the warrentless entry and search of Apartment 3 come within the exigent circumstances exception. The second issue is whether the warrantless entry and search come within the protective sweep exception. The third issue is whether the inevitable discovery doctrine bars suppression even if the entry and search were illegal.

## A.    General Fourth Amendment Principles

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment protects citizens from unreasonable searches and seizures by the government, and courts exclude evidence obtained through an unreasonable search or seizure. *United States v. Burnside,* 588 F.3d 511, 517 (7th Cir. 2009).

Warrantless entries and searches of homes are presumptively unreasonable. *Payton v. New York,* 445 U.S. 573, 586 (1980). Thus, the Fourth Amendment "prohibits a police officer

from making an unreasonable entry into a house, and an officer's warrantless entry into a house is presumed to be unreasonable." *United States v. Venters,* 539 F.3d 801, 806 (7th Cir. 2008) (internal citations omitted). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Bleavins v. Bartels*, 422 F.3d 445, 450 (7th Cir. 2005). A warrantless entry into a home may be constitutional if the police obtain consent to enter from a person with authority to give consent. *United States v. Matlock,* 415 U.S. 164, 170–71 (1974); *United States v. Henderson,* 536 F.3d 776, 779 (7th Cir. 2008). There is no dispute in this case that neither the Defendant nor his girlfriend consented to the search of Apartment 3.

Warrantless entries into private homes, although per se unreasonable under the Fourth Amendment, are subject to specific exceptions. *United States v. Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008) (citing *Mincey v. Arizona,* 437 U.S. 385 (1978)). Two exceptions to the warrant requirement could apply to the facts of this case. First, under the exigent circumstances exception, a warrantless entry and search can be lawful if there is a compelling need for official action and no time to secure a warrant. *Id.* Second, a warrentless entry and search can also be lawful if they are part of a protective sweep. *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 627 (7th Cir. 2008) (citing *Maryland v. Buie*, 494 U.S. 325, 331 (1990)). "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990).

**B.      Exigent Circumstances**

The exigent circumstances exception "provides that a 'warrantless entry by criminal law enforcement officials may be legal where there is compelling need for official action and no time to secure a warrant.'" *Fiasche*, 520 F.3d at 698 (quoting *Michigan v. Tyler,* 436 U.S. 499, 509 (1978)). A warrantless entry may be justified by hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, and the need to address the risk of danger to police and others inside or outside the dwelling. *See United States v. Risner*, Cause No. 3:08-CR-49, 2008 WL 5263406, at *2 (N.D. Ind. 2008) (citing *Georgia v. Randolph,* 547 U.S. 103, 116 n. 6 (2006)). Officers may enter under the exigent circumstances exception to protect or preserve life or avoid serious injury. *Id.* (citing *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006) (citing *Mincey v. Arizona,* 437 U.S. 385, 392 (1978)); *United States v. Bell,* 500 F.3d 609, 612 (7th Cir. 2007)). An exigent circumstance exists when the police "reasonably fear" for the safety of someone inside the premises. *Leaf v. Shelnutt,* 400 F.3d 1070, 1081 (7th Cir. 2005). The Seventh Circuit has also explained that "the police need not stand by when violence erupts and wait for a blow to render a victim unconscious, but rather may step in to prevent serious injury and restore order." *Bell*, 500 F.3d at 612.

The government bears the burden of proving that its agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry into the defendant's residence. *Fiasche*, 520 F.3d at 698. When the government claims exigent circumstances existed to support a warrantless entry into a residence, the government bears the burden of demonstrating "that a reasonable officer had a 'reasonable belief that there was a compelling need to act and no time to obtain a warrant.'" *United States v. Andrews,* 442 F.3d

996, 1000 (7th Cir. 2006) (quoting *United States v. Saadeh,* 61 F.3d 510, 516 (7th Cir. 1995)). The court must "analyze the situation from the perspective of the officers at the scene and must ask whether the officers had an objectively reasonable belief that exigent circumstances existed." *Leaf*, 400 F.3d at 1081 (internal quotations and citation omitted).

In this case, considering the circumstances known to the officers at the time, they had a reasonable belief that there was a compelling need to act, that a warrantless search was justified because of an emergency situation, and that there was no time to obtain a warrant. Officer Tapp had observed the Defendant carrying a brick and an AK-47 style rifle (with the magazine inserted), and he watched as the Defendant threw the brick through the window of a residence. The Defendant then disappeared from sight. As the officers approached the residence, they observed additional evidence of a violent disturbance and a possible bullet hole in the siding. When the Defendant approached the officers, he appeared distraught, nervous, and upset, but the rifle remained unaccounted for. The Defendant was dishonest to the officers by telling them that he was the maintenance man there to clean up the mess and mow the lawn (although he did not have a lawnmower). The Defendant's statement of his purpose and activities did not fit well with the activities that Officer Tapp himself had observed the Defendant engaged in. Considering the evidence of violence, the initial presence of the assault rifle, the Defendant's dishonesty, the disappearance of the rifle, the fact that the interior door of Apartment 3 was open, and the visible spilled beverage inside Apartment 3, the officers reasonably feared for the safety of someone in Apartment 3 and for their own safety as they investigated what was happening. It was reasonable for the police to have been concerned that an injured victim could have been in Apartment 3 and even hidden in or under the bed. *See Bell*, 500 F.3d at 613–15 (finding that exigencies permitted

the government to search a safe in a hotel room even though the kidnapping victim could not have been concealed in the safe). All of this transpired in ten or fewer minutes. Additionally, it was reasonable for the officers to be concerned about their own safety, the safety of the Defendant and other witnesses, and the safety of others at the scene. The situation in this case was fluid, and facts were slow in developing. It was not until after the search of Apartment 3 that the officers were able to confirm the safety of the residents of Apartment 1 and Apartment 2 in the house, and consequently the exigent circumstances extended beyond the search of Apartment 3. Thus, the officer's search of the bed (including his moving of the bed spread) and the resulting discovery of the rifle were within the scope of the exigent circumstances in this case.

For these reasons, the Court finds that the entry and search of Apartment 3 (including the search of the bed and the discovery of the rifle) were reasonable and fall within the exigent circumstances exception. Accordingly, the entry and search did not violate the Fourth Amendment, and the Court is not required to suppress the evidence of the gun or the Defendant's post-arrest statements as "fruit of the poisonous tree." The Defendant's Motion to Suppress will be denied.

**C.** **Protective Sweep**

Although the Court has determined that the search of Apartment 3 (including the bed) and the discovery of the rifle come within the exigent circumstances exception and thus were not unconstitutional, the Court will also consider whether the protective sweep exception applies. In *Maryland v. Buie*, the Supreme Court identified two different protective sweep circumstances. *Id.*, 494 U.S. 325, 334 (1990). The first scenario allows officers, "as an incident to the arrest"

and "as a precautionary matter and without probable cause or reasonable suspicion," to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* Second, where "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene," the search may extend beyond the parameters of the first type of protective sweep. *Id.*; *Peals*, 535 F.3d at 627. Police officers have an interest in ensuring their safety, which justifies allowing them to ensure "that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack." *Leaf*, 400 F.3d at 1087 (citing *United States v. Burrows*, 48 F.3d 1011, 1015–16 (7th Cir. 1995)) (explaining policy concerns behind protective sweep exception to warrant requirement). Whether a protective sweep is reasonable is a fact-specific inquiry. *Leaf*, 400 F.3d at 1087; *Burrows*, 48 F.3d at 1016 (stating that the inquiry is very fact specific and requires that the circumstances of a particular encounter be assessed carefully in light of the overarching policy concerns articulated in *Buie* and other cases recognizing exceptions to the warrant requirement when officer safety is at risk). In any event, the protective sweep is "not a full search of the premises" and "may extend only to a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335.

In this case, the search of Apartment 3 was a search beyond spaces immediately adjoining the place of arrest, and thus the Government must show articulable facts that warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. The Court finds that the Government has met its burden. The Defendant was observed carrying a loaded AK-47 style rifle and throwing a brick through the

window of a residence, and he disappeared from sight. The officers observed signs of a violent disturbance and a possible bullet hole in the siding. The Defendant appeared distraught, nervous, and upset, and he was dishonest to the officers. Sergeant Squadrito had also encountered the Defendant's girlfriend behind the house, and she was agitated and upset. Because the loaded rifle remained unaccounted for, the police, the witnesses, the Defendant, and others at the scene were vulnerable to attack as the police investigated the incident. Furthermore, when the decision to enter Apartment 3 was made, it was still unclear who was involved in the disturbance, whether the disturbance was over, whether there were injured victims, and who may have been armed. Considering all of these facts, the officers reasonably believed that Apartment 3 may harbor an individual posing a danger to those at the arrest scene, and they were justified in ensuring that Apartment 3 did not harbor another person who was dangerous and who unexpectedly could launch an attack.

As for the scope of the protective sweep, credible evidence was presented at the evidentiary hearing that the police, in conducting the protective sweep, were searching for people in Apartment 3 and that they were only looking in places where a person could be found hiding. As for Officer Tapp's search for a person concealed under or within the bed, the Government in its Response Brief provides a list of state and federal cases involving suspects who were concealed under mattresses, between mattresses and box springs, and in hollowed out box springs. *See, e.g., United States v. Bass*, 315 F.3d 561, 564 (6th Cir. 2002); *United States v. King*, No. 08-CR-273, 2009 WL 1393572, at *2, 6–7 (E.D. Wis. May 19, 2009). Considering the facts of this case, including the fact that the mattress and box spring were on a frame about four to eight inches off the floor, a person could have been concealed under or within the bed, and it

was reasonable for Officer Tapp to search for such a concealed person and to pull back the bed

spread to grab a hold of the mattress and box spring to lift up the bed. Thus, the search for a

person under or within the bed was within the scope of the protective search, and the discovery

of the rifle and magazine was lawful.

For these reasons, the Court finds that the entry and search of Apartment 3 (including the

search of the bed and the discovery of the rifle) were reasonable and fall within the protective

sweep exception. Accordingly, the entry and search did not violate the Fourth Amendment, and

the Court is not required to suppress the evidence of the gun or the Defendant's post-arrest

statements as "fruit of the poisonous tree." The Defendant's Motion to Suppress will be denied.


**D.      Inevitable Discovery**

Even though the Court has found that the entry and search of Apartment 3 were lawful

under the exigent circumstances exception and the protective sweep exception, the Court will

address the Government's alternative argument that the officers would have inevitably

discovered the evidence. Under the doctrine of inevitable discovery, "illegally obtained evidence

will not be excluded if the Government can prove, by a preponderance of the evidence, that the

officers 'ultimately or inevitably would have . . . discovered [the challenged evidence] by lawful

means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009) (quoting *Nix v. Williams*,

467 U.S. 431, 444 (1984)). The Government must satisfy the following two-part test: (1) "it must

show that it had, or would have obtained, an independent, legal justification for conducting a

search that would have led to the discovery of the evidence"; and (2) "the Government must

demonstrate that it would have conducted a lawful search absent the challenged conduct." *Id.* at

637–38 (citing *United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir. 1995) ("[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant . . . independent of the search.")).

The Government submits that it has satisfied both parts of this test. Based upon the facts of this case, the Government argues that there was probable cause to believe that the assault rifle was inside Apartment 3 or hidden somewhere in the space between the two houses outside the door to Apartment 3 and that Officer Tapp witnessed the Defendant commit multiple possible crimes while armed with the assault rifle, including: based upon the brick he threw through the window, at least criminal mischief (Ind. Code § 35-43-1-2), and possibly residential entry or burglary while armed with a deadly weapon (Ind. Code §§ 35-43-2-1.5 & 35-43-2-1); based upon the Defendant's criminal background, after he was secured and identified, unlawful possession of a firearm by a serious violent felon (Ind. Code § 35-47-4-5), carrying a handgun without a license (Ind. Code § 35-47-2-1), and being a felon and domestic batterer in possession of a firearm (18 U.S.C. § 922(g)(1) & (9)); and based upon the potential discharge of the firearm and the possible retaliation motive, criminal recklessness (Ind. Code § 35-42-2-2) and intimidation (Ind. Code § 35-45-2-1). The Government contends that, because there was probable cause regarding these possible crimes, the officers had ample grounds for a search warrant without relying upon the sweep of Apartment 3 and Officer Tapp's discovery of the rifle. The Government adds that, if the officers "could have safely waited on a search warrant for Apartment 3, a search warrant inevitably and certainly would have issued because probable cause was present and because the investigation of any of the above crimes could not have been completed without the assault rifle." (Gov't Resp. Br. 21–22, DE 34.) The Government also

highlights that the assault rifle was "arguably the most important piece of evidence aside from Officer Tapp's observations" and that the "investigation was not complete without an effort to find the assault rifle." (Gov't Resp. Br. 22, DE 34.) The Defendant did not reply disputing the Government's arguments, but, in his Brief in Support, the Defendant argued that, at the time of the search, "a warrant would not have been issued because there was no contraband or evidence of crime to warrant a search" and that "[t]he rifle itself [was] not contraband []or illegal." (Def. Br. in Supp. 7, DE 33.)

The Court finds that the Government has met its burden to establish inevitable discovery. The Government has shown that it had independent, legal justification for conducting a search that would have led to the discovery of the evidence. The officers had independent evidence (most especially, Officer Tapp's observations) of the Defendant's possible commission of multiple criminal offenses, and the Defendant's possession of the rifle was linked to his possible commission of several offenses. Furthermore, the independent evidence the officers had connected the Defendant to the broken window of Apartment 1, Apartment 3, and the rifle, and the disturbance (including the broken chairs, the opened door of Apartment 3, and the spilled beverage) was also linked to Apartment 3. Both Officer Tapp and Sergeant Squadrito testified that, in their training and experience, they did not think they would have had any difficulty getting a search warrant through the state judicial system based on the incident. With a warrant to search Apartment 3 for the rifle and other evidence of crimes, the officers would have discovered the rifle. Additionally, the officers would have conducted a lawful search absent the challenged conduct. The evidence presented at the evidentiary hearing shows that the officers were concerned about the Defendant's conduct (including his carrying of the rifle, his throwing

of the brick through the window of Apartment 1, and his involvement in the disturbance), they were concerned about the safety of the various occupants of the apartments, and they persisted in their investigation of the disturbance by interviewing witnesses, including the Defendant. Thus, the Court finds that, in the absence of the discovery of the rifle during the sweep of Apartment 3, the officers certainly would have applied for and obtained a warrant to search Apartment 3 as their investigation progressed, and that the rifle would have been discovered on the execution of that search warrant.

Because the inevitable discovery doctrine applies, the evidence (including the rifle, the Defendant's possession of the rifle, and the Defendant's statements admitting his possession of the rifle) would not be excluded. This doctrine provides an additional basis for denying the Defendant's Motion to Suppress.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress [DE 22] is DENIED. The Court will by separate order set this matter for a jury trial and a final pretrial conference.

SO ORDERED on March 20, 2010.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT